EAG/MSM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – X
IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR:

THE VERIZON LG FLIP PHONE WITH IMEI
355453081317101 SEIZED ON JULY 11, 2018
(THE "DIFALCO ARREST PHONE")

– and –

THE VERIZON FLIP PHONE WITH MODEL
NUMBER VN220 AND IMEI 3554 5308 1703 722
SEIZED ON JULY 11, 2018 (THE "MARATEA
ARREST PHONE")

– and –

THE SAMSUNG MODEL SM-G360T1 CELLULAR
TELEPHONE SEIZED ON JULY 11, 2018 (THE
"DISANO ARREST PHONE")

– – – – – – – – – – – – – – – – – – – – X

**18M 631**

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH
WARRANT

EASTERN DISTRICT OF NEW YORK, SS:

I, Chance Adam, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

Upon information and belief, there is probable cause to believe that there is

kept and concealed within THE VERIZON LG FLIP PHONE WITH IMEI

355453081317101 SEIZED ON JULY 11, 2018 (the "DIFALCO ARREST PHONE"),

further described in Attachment A-1 to this affidavit, the items described in Attachment B-1

1

to this affidavit, all of which constitute evidence or instrumentalities of violations of Title 18, United States Code, Sections 1962(c) and (d) (racketeering and racketeering conspiracy), 892 (extortionate extension of credit), 894 (extortionate collections), and 1955 (illegal gambling).

Upon information and belief, there is probable cause to believe that there is kept and concealed within THE VERIZON FLIP PHONE WITH MODEL NUMBER VN220 AND IMEI 3554 5308 1703 722 SEIZED ON JULY 11, 2018 (the "MARATEA ARREST PHONE"), further described in Attachment A-2 to this affidavit, the items described in Attachment B-2 to this affidavit, all of which constitute evidence or instrumentalities of violations of Title 18, United States Code, Sections 1962(c) and (d) (racketeering and racketeering conspiracy), 892 (extortionate extension of credit) and 894 (extortionate collections).

Upon information and belief, there is probable cause to believe that there is kept and concealed within THE SAMSUNG MODEL SM-G360T1 CELLULAR TELEPHONE SEIZED ON JULY 11, 2018 (the "DISANO ARREST PHONE"), further described in Attachment A-3 to this affidavit, the items described in Attachment B-3 to this affidavit, all of which constitute evidence or instrumentalities of violations of Title 18, United States Code, Sections 1962(c) and (d) (racketeering and racketeering conspiracy) and 894 (extortionate collections).

The source of your deponent's information and the grounds for his belief are

2

as follows:[1]

       1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2006. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for racketeering and other crimes associated with organized crime, and, in particular, the five organized crime families collectively known as "La Cosa Nostra." These investigations are conducted both overtly and covertly. I have participated in investigations involving search warrants and arrest warrants, as well as confidential informants and cooperating witnesses. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

       2.     I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation. Where specific recorded conversations and text messages are described and/or transcribed, they are set forth in draft form, subject to further revision, and in part and substance.

## THE DEVICES

       3.     The DIFALCO ARREST PHONE is THE VERIZON LG FLIP

---

[1]    Because this affidavit is submitted for the limited purpose of establishing probable cause for the search warrant, I have not set forth each and every fact learned during the course of the investigation.

PHONE WITH IMEI 355453081317101 SEIZED ON JULY 11, 2018. On July 11, 2018,

while executing an arrest warrant on DIFALCO at his residence, law enforcement officers

conducted a protective sweep observed the phone on DIFALCO's night stand in plain view

and seized it. Photographs of the DIFALCO ARREST PHONE are included within

Attachment A-1.

    4.    The MARATEA ARREST PHONE is THE VERIZON FLIP PHONE

WITH MODEL NUMBER VN220 AND IMEI 3554 5308 1703 722 SEIZED ON JULY 11,

2018. On July 11, 2018, the MARATEA ARREST PHONE was seized from MARATEA's

pocket, incident to MARATEA's arrest pursuant to an arrest warrant.

    5.    The DISANO ARREST PHONE is THE SAMSUNG MODEL SM-

G360T1 CELLULAR TELEPHONE SEIZED ON JULY 11, 2018. On July 11, 2018 law

enforcement officers executed an arrest warrant on DISANO at DISANO's residence.

DISANO brought the DISANO ARREST PHONE with him as he was taken into custody.

Photographs of the DISANO ARREST PHONE are included within Attachment A-3.

    6.    The DIFALCO ARREST PHONE, the MARATEA ARREST PHONE

and the DISANO ARREST PHONE are collectively referred to herein as the "Devices," and are currently in the custody of the FBI within the Eastern District of New York

## THE INDICTMENT AND ARREST WARRANTS

    7.    On July 5, 2018, a grand jury in the Eastern District of New York

returned an indictment charging JERRY CIAURI, VITO DIFALCO, JOSEPH MARATEA,

SALVATORE DISANO and ANTHONY LICATA with numerous offenses. CIAURI,

DIFALCO, MARATEA and DISANO each were charged with racketeering from on or about

4

and between December 2010 and June 2018, in violation of Title 18, United States Code,

Section 1962(c), based on their association with the Colombo organized crime family

("Colombo family") of La Cosa Nostra ("LCN"), with an alleged pattern of racketeering

activity involving extortionate extension of credit conspiracy, illegal gambling, money

laundering, and several instances of extortionate collection of credit and extortionate

collection of credit conspiracy. The indictment also charges DIFALCO and MARATEA

with violations of Title 18, United States Code, Sections 892(a) (extortionate extension of

credit conspiracy), 894(a)(1) (extortionate collection of credit conspiracy and extortionate

extension of credit) and 1955(a) (illegal gambling) and DISANO with violations of Title 18,

United States Code, Sections 894(a)(1) (extortionate collection of credit conspiracy and

extortionate extension of credit) and 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) (money

laundering and money laundering conspiracy).

      8.      On July 5, 2018, the Honorable Sanket J. Bulsara, United States

Magistrate Judge, Eastern District of New York, issued warrants for CIAURI's,

DIFALCO's, MARATEA's and DISANO's arrest.

      9.      On July 11, 2018, law enforcement officers arrested CIAURI,

DIFALCO, MARATEA and DISANO pursuant to the arrest warrants.

### THE DEFENDANTS AND LA COSA NOSTRA

      10.      The indictment arose from an investigation of CIAURI, DIFALCO,

MARATEA, DISANO (and others) with respect to their participation in a long-running

racketeering conspiracy involving the criminal affairs of the Colombo organized crime

family of La Cosa Nostra (the "Colombo family" and "LCN," respectively) following receipt of information from a cooperating witness ("CW-1").[2]

11.     Based on debriefing cooperating witnesses and confidential informants, reviewing electronic surveillance, speaking with other law enforcement agents, and reviewing documentary and physical evidence, I am aware of the following facts, among other facts, about the Colombo family and LCN.

12.     The members and associates of LCN constitute an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. LCN constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise. LCN engages in, and its activities affect, interstate and foreign commerce. LCN is an organized criminal group that operates in the Eastern District of New York and elsewhere.

13.     The members and associates of the Colombo family also constitute an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The Colombo family constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the

---

[2]     CW-1 has sustained numerous prior convictions, including convictions for larceny and fraud-related crimes, and for a period of time received funds from the FBI to assist CW-1 in paying debts to Colombo family member Jerry Ciauri. As described herein, during his attempts at cooperating with the FBI, CW-1 lied to FBI agents about certain events to conceal CW-1's purchase and use of heroin. Notwithstanding CW-1's false statements to conceal his heroin purchase and use, information supplied by CW-1 has been corroborated in numerous respects, including by consensual recordings and physical surveillance and, to the extent relied upon herein, I believe it to be reliable and credible.

objectives of the enterprise. The Colombo family engages in, and its activities affect, interstate and foreign commerce. The Colombo family is an organized criminal group that operates in the Eastern District of New York and elsewhere.

14. LCN operates through organized crime families. Five of these crime families -- the Bonanno, Colombo, Gambino, Genovese and Luchese families -- are headquartered in New York City and supervise criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decavalcante family, operates principally in New Jersey, but from time to time also in New York City.

15. The ruling body of LCN, known as the "Commission," consists of leaders from each of the crime families. The Commission convenes from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

16. The Colombo family has a hierarchy and structure. The head of the Colombo family is known as the "boss." The Colombo family boss is assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss is responsible for, among other things, setting policy and resolving disputes within and between LCN crime families and other criminal groups. The administration further supervises, supports, protects and disciplines the lower-ranking participants in the crime family. In return for their supervision and protection, the

7

administration receives part of the illegal earnings generated by the crime family. Members of the Colombo family serve in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Colombo family has been overseen by a "panel" of crime family members that do not include the boss, underboss and/or consigliere.

17.    Below the administration of the Colombo family are numerous "crews," also known as "regimes" and "decinas." Each crew is headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consists of "soldiers" and "associates." The captain is responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often receives a share of the crew's earnings.

18.    Only members of the Colombo family can serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family are referred to on occasion as "goodfellas" or "wiseguys," or as persons who have been "straightened out" or who have their "button." Associates are individuals who are not members of the crime family, but who nonetheless engage in criminal activity for, and under the protection of, the crime family.

19.    Many requirements exist before an associate can become a member of the Colombo family. The Commission of LCN from time to time limits the number of new members that can be added to a crime family. An associate is also required to be proposed for membership by an existing crime family member. When the crime family's

8

administration considers the associate worthy of membership, the administration then circulates the proposed associate's name on a list given to other LCN crime families, which the other crime families review and either approve or disapprove. Unless there is an objection to the associate's membership, the crime family then "inducts," or "straightens out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swears allegiance for life to the crime family above all else, even the associate's own family; swears, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swears to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

20.    The principal purpose of the Colombo family is to generate money for its members and associates. This purpose is implemented by members and associates of the Colombo family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo family also further the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

21.    Although the primary purpose of the Colombo family is to generate money for its members and associates, the members and associates at times use the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise are asked and expected to carry out, among other crimes, acts of violence,

including murder and assault.

22.     The members and associates of the Colombo family engage in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities.  That conduct includes a commitment to murdering persons, particularly members or associates of the crime families, who are perceived as potential witnesses against members and associates of the enterprise.

23.     Members and associates of the Colombo family often coordinate criminal activity with members and associates of other organized crime families.

24.     The Colombo family, through its members and associates, engages in racketeering activity as defined in Title 18, United States Code, Section 1961(1), consisting of acts involving violations of state law to include but not limited to, murder, and violations of federal law to include, but not limited to, murder, robbery, extortion, loansharking, and illegal gambling.

## USE OF CELLULAR TELEPHONES
### IN FURTHERANCE OF RACKETEERING ACTIVITY

25.     The investigation, including telephone calls and text messages intercepted pursuant to a court-authorized wiretap on a cellular telephone used by DIFALCO[3] and a cellular telephone used by Ciauri has revealed that DIFALCO,

---

[3] On May 9, 2018, law enforcement agents executed search warrants issued by the Honorable Marilyn D. Go and seized from DIFALCO, among other things, a cellular telephone assigned the call number that was the subject of the prior wiretap orders and a cellular telephone from MARATEA.

10

MARATEA and DISANO, together with others, are engaged in racketeering involving the criminal affairs of the Colombo organized crime family of La Cosa Nostra (the "Colombo family" and "LCN," respectively), in violation of Title 18, United States Code, Sections 1962(c) and (d), including the making and collecting of extortionate extensions of credit, in violation of Title 18, United States Code, Sections 892 and 894, and operating an illegal gambling business, in violation of Title 18, United States Code, Section 1955, among other offenses, and that DIFALCO, MARATEA and DISANO (and others) used cellular telephones in furtherance of those offenses. Specifically, the indictment alleges, among other crimes, that DIFALCO and Ciauri used extortionate means to collect a debt owed by John Doe #6 between December 2017 and June 2018, that DIFALCO and MARATEA used extortionate means to collect a debt owed by John Doe #8, John Doe #9 and John Doe #10 between January 2018 and June 2018, and that DISANO and Ciauri used extortionate means to collect a debt owed by John Doe #3 and John Doe #4 between December 2017 and June 2018.

26. Significantly, pursuant to the wiretaps on Ciauri's and DIFALCO's telephones, FBI agents intercepted telephone calls between Ciauri and DISANO, between DIFALCO and Ciauri, between DIFALCO and MARATEA, on which they discussed their participation in many of the charged crimes. The intercepted communications revealed, among other things, (i) communications between Ciauri and DISANO regarding the collection of debt owed by John Doe #3; (ii) communications between Ciauri and DISANO regarding the collection of debt owed by John Doe #4; (iii) communications between Ciauri

11

and DIFALCO regarding the collection of debt owed by John Doe #6; (iv) communications

between DIFALCO and MARATEA and regarding the collection of debt owed by John Doe

#8; (v) communications between DIFALCO and MARATEA regarding the collection of debt

owed by John Doe #9; and (vi) communications between DIFALCO and MARATEA

regarding the collection of debt owed by John Doe #10.

        27.    A review of telephone records for telephone numbers used by

DISANO, MARATEA and DIFALCO shows that DISANO contacted John Doe #3 and John

Doe #4 by telephone; that DIFALCO contacted John Doe #6, John Doe #7, John Doe #8,

John Doe #9 and John #10 by telephone; and that MARATEA contacted John Doe #8, John

Doe #9 and John #10 by telephone. (The telephones on which DIFALCO and MARATEA

contacted John Doe #8, John Doe #9 and John Doe #10 were seized on or about May 9,

2018, but given that cellular telephones were seized from them upon their arrest, there is

probable cause to believe that both obtained new cellular telephones and that they used those

phones to contact one or more of their victims and/or other coconspirators.)

        28.    The indictment also charged DIFALCO with operating a sports-betting

business between January 2018 and June 2018. The wiretap on DIFALCO's cellular

telephone revealed that DIFALCO frequently contacted telephone number (888) 376-1482

(the "1482 Business") to obtain a "customer rundown," which was a list of the users and the

amounts of money that they had won or lost. For example, on March 18, 2018 at 7:13 p.m.

(#7994), Difalco called the 1482 Business and asked for a "customer rundown." The

operator answered as follows: "170 – 2894. 180 -69. 181 -314. 182 +126. 183 +4875. 184

+590. 186 +1195. 189 -19. 191 +855. 196 -210. 959 -474." On March 22, 2018 at 9:48 p.m. (#8703), Difalco called the 1482 Business, identified himself as "Mask/UN1013," and asked for a "customer rundown." The operator responded: "170 plus 959, 180 minus 108, 181 plus 557, 182 minus 265, 184 minus 700, 186 minus 1775, 191 plus 410, 959 minus 150." Difalco then asked for the "bottom line," to which the operator responded, "Nine players -1272." Based on my training and experience, the evidence collected during the investigation and the context of the conversations intercepted, I believe that those calls are in furtherance of an illegal gambling operation involving sports-betting and that DIFALCO was asking the operator at the wire room of the 1482 Business about his illegal gambling customers' wagering balances.

### CELLULAR TELEPHONE USE BY MEMBERS AND ASSOCIATES OF LCN

29.    Based on my training, experience and knowledge of this investigation, including the information described above, I know that individuals involved in LCN often communicate with the victims of their illegal activities (such as loanshark victims and gambling debtors) by cellular telephone.

30.    Based on my training, experience and knowledge of this investigation, I know that individuals involved in LCN use cellular telephones to arrange meetings with other members and associates of LCN. For example, numerous consensual recordings and wiretap recordings and/or information provided by confidential sources have revealed that members and associates of LCN communicate using cellular telephones. Additionally,

confidential sources have advised that members and associates of LCN communicate with other organized crime members and associates using cellular telephones.

31.     Based on my training, experience and knowledge of this investigation, I know that individuals involved in LCN frequently store their criminal associates' contact information in their cellular telephones and communicate through text messages.

## TECHNICAL TERMS

32.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

14

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

15

ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and

16

receive e-mail. PDAs usually include a memory card or other removable
storage media for storing data and a keyboard and/or touch screen for entering
data. Removable storage media include various types of flash memory cards
or miniature hard drives. This removable storage media can store any digital
data. Most PDAs run computer software, giving them many of the same
capabilities as personal computers. For example, PDA users can work with
word-processing documents, spreadsheets, and presentations. PDAs may also
include global positioning system ("GPS") technology for determining the
location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique
    numeric address used by computers on the Internet. An IP address is a series
    of four numbers, each in the range 0-255, separated by periods (e.g.,
    121.56.97.178). Every computer attached to the Internet computer must be
    assigned an IP address so that Internet traffic sent from and directed to that
    computer may be directed properly from its source to its destination. Most
    Internet service providers control a range of IP addresses. Some computers
    have static—that is, long-term—IP addresses, while other computers have
    dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic
    devices that communicate with each other. Due to the structure of the Internet,

17

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the

same state.

33.     Based on my training, experience, and research, I know that the

Devices may have capabilities that allow it to serve as a wireless telephone, digital camera,

portable media player, GPS navigation device, and PDA. In my training and experience,

examining data stored on devices of this type can uncover, among other things, evidence that

reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.     Based on my knowledge, training, and experience, I know that

electronic devices such as the Devices can store information for long periods of time.

Similarly, things that have been viewed via the Internet are typically stored for some period

of time on such devices. This information can sometimes be recovered with forensics tools.

35.     *Forensic evidence.* As further described in Attachments B-1, B-2 and

B-3, this application seeks permission to locate not only electronically stored information

that might serve as direct evidence of the crimes described on the warrant, but also forensic

evidence that establishes how the Devices was used, the purpose of its use, who used it, and

when. There is probable cause to believe that this forensic electronic evidence might be on

the Devices because:

18

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

19

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that in the Device there exists evidence of crimes. Accordingly, a search warrant is requested.

39.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application and search

20

IT IS FURTHER REQUESTED that all papers submitted in support of this

application, including the application and search warrant, be sealed until further order of the

Court.

Special Agent Chance Adam
Federal Bureau of Investigation

Sworn to before me this
11th day of July, 2018

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

22

**ATTACHMENT A-1**
<u>Property to Be Searched</u>

THE VERIZON LG FLIP PHONE WITH IMEI 355453081317101 SEIZED
ON JULY 11, 2018 (the "DIFALCO ARREST PHONE"). Photographs of the DIFALCO
ARREST PHONE are below. This warrant authorizes the forensic examination of the
DIFALCO ARREST PHONE for the purpose of identifying the electronically stored
information described in Attachment B-1.

 

23

2

**ATTACHMENT B-1**
Property to be Seized

1.      All records on the DIFALCO ARREST PHONE described in Attachment A-1

that relate to violations of Title 18, United States Code, Sections 1962(c) and (d), 892 and

894 and involve Vito Difalco, for the time period between December 1, 2017 and the present,

including, but not limited to, to the following:

      a.      Communications with members and associates of La Cosa Nostra

("LCN");

      b.      Names, contact information and other information concerning of LCN

members and associates;

      c.      Photographs of, and communications concerning, gambling records;

and

      d.      Photographs of LCN members and associates; and

2.      Evidence of user attribution showing who used or owned the device at the time

the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history.

      As used above, the terms "records" and "information" include all of the

foregoing items of evidence in whatever form and by whatever means they may have been

created or stored, including any form of computer or electronic storage (such as flash

memory or other media that can store data) and any photographic form.

2

**ATTACHMENT A-2**
Property to Be Searched

THE VERIZON FLIP PHONE WITH MODEL NUMBER VN220 AND IMEI 3554 5308 1703 722 SEIZED ON JULY 11, 2018 (the "MARATEA ARREST PHONE"). Photographs of the MARATEA ARREST PHONE are below. This warrant authorizes the forensic examination of the MARATEA ARREST PHONE for the purpose of identifying the electronically stored information described in Attachment B-2.

3

2

**ATTACHMENT B-2**
Property to be Seized

1.      All records on the MARATEA ARREST PHONE described in Attachment A-

2 that relate to violations of Title 18, United States Code, Sections 1962(c) and (d), 892 and

894 and involve Joseph Maratea, for the time period between December 1, 2018 and the

present, including, but not limited to, to the following:

    a.      Communications with members and associates of La Cosa Nostra

("LCN");

    b.      Names, contact information and other information concerning of LCN

members and associates;

    c.      Photographs of, and communications concerning, gambling records;

and

    d.      Photographs of LCN members and associates; and

2.      Evidence of user attribution showing who used or owned the device at the time

the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history.

        As used above, the terms "records" and "information" include all of the

foregoing items of evidence in whatever form and by whatever means they may have been

created or stored, including any form of computer or electronic storage (such as flash

memory or other media that can store data) and any photographic form.

2

**ATTACHMENT A-3**
<u>Property to Be Searched</u>

THE SAMSUNG MODEL SM-G360T1 CELLULAR TELEPHONE
SEIZED ON JULY 11, 2018 (the "DISANO ARREST PHONE"). Photographs of the
DISANO ARREST PHONE are below. This warrant authorizes the forensic examination of
the DISANO ARREST PHONE for the purpose of identifying the electronically stored
information described in Attachment B-3.

 

3

2

## ATTACHMENT B-3
Property to be Seized

1.    All records on the DISANO ARREST PHONE described in Attachment A-3 that relate to violations of Title 18, United States Code, Sections 1962(c) and (d) and 894 and involve Salvatore Disano, for the time period between December 1, 2017 and the present, including, but not limited to, to the following:

        a.    Communications with members and associates of La Cosa Nostra ("LCN");

        b.    Names, contact information and other information concerning of LCN members and associates;

        c.    Photographs of, and communications concerning, gambling records; and

        d.    Photographs of LCN members and associates; and

2.    Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

        As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2